TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

_____

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 96-1209 |
| of | : | |
| | : | December 31, 1996 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| J. LINDSAY BOWER | : | |
| Deputy Attorney General | : | |
| | : | |

_____


THE PUBLIC UTILITIES COMMISSION has requested an advisory opinion, pursuant to Public Utilities Code section 854, subdivision (b)(3), on the following questions:

1.      Will the proposed acquisition of Pacific Telesis Group by SBC Communications, Inc. adversely affect competition?

2.      What mitigation measures could be adopted to avoid any adverse effects on competition that do result?

CONCLUSIONS

1.      The proposed acquisition of Pacific Telesis Group by SBC Communications, Inc. should not adversely affect competition in the markets for telephone or wireless services.

2.      Mitigation measures are not required, but we recommend that the Commission maintain a stable system of price cap regulation for telephone services.

Accordingly, we have concluded that the acquisition will not adversely affect competition within the meaning of Public Utilities Code section 854, subdivision (b)(3).

ANALYSIS

The proposed acquisition of Pacific Telesis by SBC Communications would unify two of the Bell Operating Companies divested from AT&T in 1984. In this proceeding, Pacific Telesis and SBC Communications have applied to the California Public Utilities Commission for authorization to transfer from Telesis to SBC indirect control of Pacific Bell. Pursuant to Public Utilities Code 854, the Attorney General of California submits this opinion on the competitive effects of this merger upon California telecommunications markets.

Several parties have intervened and protested the application. AT&T and MCI claim that the merger will reduce competition by eliminating SBC as a possible supplier in future markets for local and other services. The Office of Ratepayer Advocates does not specifically contend that the merger would be anticompetitive, but does propose certain conditions designed to address allegedly adverse effects of the merger upon state and local economies, service quality, company management, employee relations, and regulatory effectiveness.[1] Likewise, Utilities Consumer Action Network (UCAN) proposes the creation of a regulatory agency to mitigate the alleged "*potential* ability [of the merged entity] to engage in predation." Contending that "SBC has a long, well-documented history of aggression and misbehavior," the Association of Directory Publishers requests restrictions over the manner in which the surviving company provides or uses directory listing information.[2] The applicants have also settled with Teleport Communications Group, Inc., ICG Access Services, Inc., the City and County of San Francisco, CWA and with intervenors represented by Public Advocates and the Greenlining Institute. On November 5, 1996, the United States Department of Justice separately closed its investigation after concluding that the merger did not violate the antitrust laws.

We find that Pacific Telesis and SBC are neither actual nor potential competitors in any relevant California market for telecommunications services. Primarily for that reason, this office concludes that the merger in itself will have no adverse effects upon competition. We also conclude that the merged entity would not cross-subsidize its long distance affiliates in restraint of trade and we continue to support efforts by the BOCs to enter that market. Nonetheless, there may be unregulated services for which such strategies would be effective under cost-based regulation. We recommend that the Commission maintain its price cap system both to minimize incentives to engage in cross-subsidization strategies and to provide a stable environment for industry investment.

I. **PRIOR PROCEEDINGS AND THE NATURE OF THIS OPINION**

---

[1] ORA has proposed 47 conditions to approval of the merger. See Joint Brief of Applicants at Appendix A. The most stringent of these proposals include: "requir[ing] the merged company to maintain the same level of annual investment over the next 10 years," Selwyn Direct Test. at 177; "extending indefinitely the NRF sharing requirements to ensure that if unforeseen efficiencies result from the merger, ratepayers are compensated for these efficiencies," Selwyn Direct Test. at 183; providing California wireless services through a separate affiliate, Selwyn Direct Test. at 192; and expanding the period during which the merged companies would retain separate affiliates for manufacturing, in-region interLATA, and interLATA information services, Selwyn Direct Test. at 192.

[2] Pflaum Direct Test. at 30-35.

A.    **Section 854(b)**

This transaction is to be accomplished by merging SBC Communications (NV) Inc., a wholly-owned subsidiary of SBC, with and into Pacific Telesis.  Upon completion of the merger, Telesis will cease to exist as an independent entity, control of Telesis will transfer to SBC, and Telesis will become a wholly-owned subsidiary of SBC.  The merger will also indirectly transfer control of Nevada Bell and other subsidiaries currently owned or controlled by Telesis.

Although they view this acquisition as a mere "transfer of indirect control" of Pacific Bell's operations, and not as an acquisition of or by a public utility within the meaning of California Public Utilities Code section 854(b),[3] the applicants have submitted the transaction to PUC review under the criteria set forth in that provision.[4]

B.    **This Advisory Opinion**

This is the fourth opinion letter submitted by this office under the 1989 amendments to Section 854.[5]  Public Utility Code section 854 refers to the opinion as advisory.[6]  Consequently this

---

[3]The applicants contend that, "The statute's use of the term `utilities' in subsection (b), and the different term `entities' in subsection(c), must, under time-honored principles of statutory construction, be assumed to be intentional and legally significant. . . . Neither *party* to the merger transaction which will result in the transfer of control of Pacific Bell -- i.e., Telesis or SBC -- is a utility.  . . .  Thus, the transfer of control resulting from the parent-level merger is subject only to the Section 854(c) criteria."   Prehearing Conference Statement of Pacific Telesis Group and SBC Communications Inc. (June 14, 1996).

[4]See Applicants' Prehearing Conference Statement, at 6.

[5]See Opinion of the Attorney General on Competitive Effects of Proposed Merger of American Telephone & Telegraph Company and McCaw Cellular Communications, Inc., 77 Cal.Ops.Atty.Gen. 50 (1994); Opinion of the Attorney General on Competitive Effects of Proposed Merger of GTE and Contel Corporations, Submitted Pursuant to PU Code Section 854(b)(2); Opinion of the Attorney General on the Proposed Acquisition of San Diego Gas and Electric Company by SCEcorp, the Parent of Southern California Edison Co., 73 Cal.Ops.Atty.Gen. 366 (1990).

[6]Section 854(b) provides in pertinent part:

"Before authorizing the merger, acquisition or control of any electric, gas, or telephone utility organized and doing business in this state . . ., the commission shall find that the proposal does all of the following:

"(1) Provide short-term and long-term benefits to ratepayers.

"(2) Equitably allocates, where the commission has ratemaking authority, the total short-term and long-term forecasted economic benefits, as determined by the commission, of the proposed merger, acquisition, or control, between shareholders and ratepayers.   Ratepayers shall receive not less than 50 percent of those benefits.

"(3) Not adversely affect competition.   In making this finding, the commission shall request an advisory opinion from the Attorney General regarding

document does not control the PUC's finding under section 854, subdivision (b)(3). However, the Attorney General's advice is entitled to the weight commonly accorded an Attorney General's opinion (see, e.g., *Moore* v. *Panish* (1982) 32 Cal.3d 535, 544 ("Attorney General opinions are generally accorded great weight"); *Farron* v. *City and County of San Francisco*, (1989) 216 Cal.App.3d 1071).

### C.	Evidentiary Basis of This Opinion

During the course of our review, we held numerous discussions with the parties and PUC staff and obtained substantial materials from them pertaining to the issues discussed. We also reviewed testimony filed in these proceedings, along with the transcripts of witnesses who testified on the competitive effects of this transaction. Additional information was obtained from other members of the industry and from staff of other governmental agencies. We have also relied upon Professor Frank Wolak and Professor Robert Michaels to obtain further background information and a better understanding of the industry.

## II.	THE MERGER

This proposed merger would create the largest supplier of local services in the United States and the sixth largest telecommunications firm in the world.[7] Both Telesis and SBC currently generate most of their revenues from local, access, and intraLATA services. In addition, SBC is a major supplier of cellular services. Pursuant to the Modified Final Judgment ("MFJ"), both firms were until this year also prohibited from offering interLATA services in competition with AT&T and other long distance carriers.

Through its Pacific Bell subsidiary, Telesis serves approximately 75 percent of California's 31 million residents. SBC provides local telephone services through its Southwestern Bell subsidiary in the states of Texas, Arkansas, Oklahoma, Kansas, and Missouri. The acquiring company, which has its corporate headquarters in San Antonio, Texas, has "no operations"[8] and does an insignificant amount of business in California. In addition, SBC offers wireless services under the Cellular One brand in 27 markets, including Chicago, Boston, Baltimore, and Washington, D.C.[9]

### A.	The Purpose of this Merger

---

whether competition will be adversely affected and what mitigation measures could be adopted to avoid this result."

[7]NYNEX and Bell Atlantic recently agreed to merge. If approved, their merger would create the largest local telephone company in the United States.

[8]Application at 23. SBC does, however, have a passive three percent ownership interest in Bay Area Cellular. Application at 16 n.8.

[9]Application at 22.

This merger is a strategic response to recent changes within the telecommunications market. Consistent with industry predictions,[10] both applicants envision a convergence toward "one stop shopping"[11] for telecommunications services. According to this view, consumers will soon demand a highly integrated bundle of services, including at least the local and long distance components of both landline and wireless services. Earlier this year, Congress accelerated this trend toward expanded product dimensions by eliminating the exclusive local franchises held by many local carriers within the United States.[12]

The merger thus represents an adjustment to shifts in consumer demand, shifts which require the applicants, like firms in any industry, to attain the "right mix of products, economies of scope and scale, and financial resources to survive competition with aggressive new entrants."[13] According to the applicants, the merger, will, in fact, offer significant scope and scale economies,[14] facilitate entry by Telesis into the long distance,[15] internet and video markets, and provide expanded geographic reach within the United States and foreign markets. In addition, SBC will strengthen Telesis's weakened financial condition[16] and offer strong wireless experience.[17] Telesis, on the other hand, is a leader among the BOCs in reducing operating costs[18] and is a major supplier of internet services.[19] Perhaps most important, the applicants claim that the merger will benefit consumers

---

[10]Huber, Kellog & Thome, *The Geodesic Network: 1993 Report on Competition in the Telephone Industry* ("*Geodesic Network II*"). In 1987, Peter Huber prepared *The Geodesic Network: 1987 Report on Competition in the Telephone Industry* ("*Geodesic Network I*") for the Justice Department's "First Triennial Review" of the MFJ.

[11]Kahan Direct Test. at 30; Dorman Direct Test. at 4; Dorman Reply Test. at 6 ("Market conditions will favor integrated carriers who can bundle long distance services with local services. Customer preference for `one stop shopping' is clear, and Pacific Bell will be handicapped for some time by not being able to provide the integrated bundle of services."); Selwyn Direct Test. at 154; Gilbert Trans. at 685.

[12]Application at 2.

[13]Application at 3.

[14]Perl Direct Test., Exhibit 2, at 6-8.

[15]Response to Request No.: DRA-SBC-001.

[16]"Telesis' operating revenues have remained essentially unchanged since 1991, and Telesis' share prices have deteriorated as a result of the prospects for competition and the capital markets' perceptions about Telesis' ability to respond effectively. Telesis' debt rating is under close scrutiny by the rating agencies with several actions taken by the agencies over the last year, its cost of capital has increased, and its financial resources stretched to support adequately its capital requirements." Response to Data Request No. 70 (UCAN-002); Application at 6, 40; Perl Direct Test., Exhibit 2, at 12-13.

[17]Application at 10, 28-31; Perl Direct Test. at 7.

[18]Telesis operating costs are among the lowest in the country. Dorman Rebuttal Test. at 12; Perl Direct Test. at 7; Response to Data Request No. PTG-047; D.95-12-052, at 12.

[19]Application at 9.

because it "is likely to result in substantial price reductions in the interexchange, wireless and international telephone markets which are not now as competitive as they might be."[20]

### B. Telesis and SBC Telephone Services

Both of the applicants offer local, access and intraLATA toll services within their service regions.[21] In California, competition is increasingly intense for services whose allowed rates exceed their costs. These services include dedicated access, business switched access, and intraLATA toll. On the other hand, LECs are the only suppliers of most residential local and residential switched access services because those services are heavily subsidized.

Until recently, government regulation and sunk costs[22] presented virtually insuperable barriers to entry into all telecommunications markets. The Telecommunications Act of 1996 and PUC deregulatory efforts, however, opened all telecommunications markets to competition. Technological advances have also reduced sunk costs by permitting selective entry[23] and by offering cost and performance advantages over existing technologies.[24] The resulting pursuit of monopoly rents offered by high valued customers[25] is the essence of the competitive process.

Competitive and technological forces have also induced both Telesis and SBC to expand their service offerings. In 1993, Telesis announced plans to spend $16 billion on an "advanced integrated broadband telecommunications network."[26] SBC has similar plans. In June 1996, it

---

[20]Response to Data Request No. DRA-PTRG-028. AT&T and MCI implicitly contend that the merger may reduce long distance rates between Telesis and SBC service areas because the merged entity will base profit-maximizing prices upon the actual cost of providing switched access rather than the higher rate it charges long distance suppliers for such services. See Brenner Direct Test. at 33-35.

[21]Telesis reported its 1995 revenues as follows: local services, $3,815 million; network access, $2,447 million; toll services, $1,232 million; other services, $1,548 million. Pacific Telesis Proxy Statement, at F-19 (Mar. 15, 1996). SBC reported 1995 revenues, as follows: local services, $6,549 million; network access, $3067 million; long distance service, $840 million; other services, $1,260 million. SBC Communications Inc. 1995 Annual Report, at 32.

[22]A cost is "sunk" if it is paid upon entry but is not recoverable upon exit. See Larson, *An Economic Guide to Competitive Standards in Telecommunications Regulation*, 1 CommLaw Conspectus 31, 51 (1993).

[23]"[A] new entrant need not duplicate the . . . entire transmission and switch system[ ] to enter the market profitably. The entrant need only enter portions of the market where the expected revenues exceed the expected costs of providing new service." Spulber, *Deregulating Telecommunications*, 12 Yale J.Reg. 25, 47 (1995).

[24]Spulber, *supra*, at 47-49

[25]Harris, *Competition in California Telecommunications Markets: Implications for Local Competition Policies*, at 13 (Oct. 10, 1995)("Harris Rept.") attached to Testimony of Dr. Robert G. Harris (I.95-04-044, Oct. 10, 1995); Selwyn Trans. at 3024-26.

[26]Telesis subsequently suspended planned construction in Los Angeles and Orange County and reduced its capital expenditure plans by $1.4 billion. Response to Data Request No. DRA-PTG-049.

reported that it had "completed the upgrade of 14 central offices across [Texas] to provide for end-to-end digital connectivity and ISDN overlay. Twelve additional central offices are scheduled for network upgrades in 1996."[27]

## 1. **Local Network Services**

Local exchange carriers ("LECs"),[28] such as Pacific Bell and SBC, provide the wires or the "local loops" that physically connect users to each other and to long distance carriers ("interexchange carriers" or "IECs"). Local exchange carriers also provide the local switching facilities that direct calls to a local party or the long distance carrier, depending upon the number dialed. A call is "local" if it is placed within the area in which flat-rate subscribers may call at no extra charge.[29]

In California, local telephone exchanges were until recently legally protected exclusive franchises. The Telecommunications Act of 1996[30] and recent PUC rulings,[31] however, dissolved these restrictions. As a result, suppliers are aggressively entering many California local markets.

Initial entry by fully competitive firms will be in commercial areas, where traffic densities are highest. The cost of providing service to most residential customers significantly exceeds allowed rates.[32] Unable to profitably offer services with their own facilities, new competitors will

---

[27] See "Scope of Competition in Texas" at 20-21 (June 14, 1996), attached as Tab A, Bates No. SBCCAL012465-012534 to Response to ALJ Question No. 4 of July 29, 1996 (Aug. 15, 1996).

[28] The LEC nomenclature is somewhat confusing because of the *AT&T* consent decree, which completely redrew the areas in which different types of telephone companies were allowed to operate. The traditionally exclusive right of local telephone companies to provide service for calls which originate and end within their service territories was unchanged. However, the LECs owned by the Bell Operating Companies ("BOCs") were prohibited from carrying telephone traffic out of judicially-defined "exchange" areas, or LATAs ["LATA" is an acronym for "Local Access and Transport Area." *U.S.* v. *Western Electric Co., Inc.*, 569 F.Supp. 990, 993 n.9 (D.D.C.1983)(the *"LATA" Decision"*)], which subsumed the local companies' service areas.

[29] In California, this area usually includes the exchange to which the subscriber's line is directly connected (the "end office"), contiguous exchanges, and other exchanges within 12 miles of the subscriber's end office. All remaining calls -- both intra- and interLATA -- between exchanges, except for Zone Usage Measurement ("ZUM") and Extended Area Services ("EAS"), are "toll" services. California Public Utilities Commission Division of Ratepayer Advocates, Report on Policy and Technical Issues in I. 87-11-033, Phase III, at 3-4 (Feb. 8, 1991) ("1991 DRA Policy Report").

[30] Section 253(a) of the Act provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

[31] The PUC opened California local markets to facilities-based suppliers on January 1, 1996. Resale markets were opened on March 31, 1996. D.95-07-054 (July 1995).

[32] *IRD*, *supra*, D.94-09-065, at 298, 315. Many--perhaps 70%--of the residential customers served by Telesis receive substantial subsidies from sales of other types of services. Gordon Rebuttal Test. at 9; Harris Rept., *supra*, at 2.

"resell"[33] Telesis services in those markets.[34] Suppliers can more readily offer "facilities-based" services, on the other hand, in urban areas where routing and traffic economies reduce unit costs.

By combining these resale and facilities-based services, the major long distance carriers, competitive access providers ("CAPs"), and some LECs plan to offer comprehensive service in Telesis markets in the very near future. Thus, AT&T, which is now installing switches in virtually every region of the United States served by the BOCs,[35] plans to capture one-third of the local service business market within five to ten years.[36] MCI and Sprint have similar intentions,[37] although their projections are less ambitious. Local carriers likely to enter Telesis markets in California include GTE, the largest local exchange company in the country, and U.S. West.[38] At some point, wireless and cable[39] companies may also offer competitive services in this market.

---

[33]Section 251(c) of the Act requires local carriers to (a) provide "interconnection" to their networks at reasonable rates and (b) to "offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers."

[34]The appropriate wholesale rate for local services has been intensely debated. The BOCs generally advocate calculating wholesale service under the "efficient component pricing rule" (ECPR), which would include all opportunity costs within the price, including the lost contribution to margin from final sales. D.96-03-020, at 8. See Baumol and Sidak, The Pricing of Inputs Sold to Competitors, 11 Yale J. on Reg. 171 (1994). In PUC proceedings, AT&T and MCI advocated a rule which would set wholesale prices at retail rates less avoided retail costs, such as billing and collection, sales and marketing, and processing end-user service orders. *Id.* at 11. The PUC adopted the AT&T model, but not its calculations. *Id.* at 31-32.

In its *First Report and Order*, the FCC set forth an allowed range of "default" discounts from LECs' estimated avoided costs. *First Report and Order, Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, at ¶¶865-877 (CC Docket No. 96-98, Aug. 8, 1996). The FCC rejected the ECPR method as inconsistent with total service long run incremental cost methodology. Id. at ¶¶708-711. The Eighth Circuit, however, stayed the FCC order, which would have established "default" discount rates of between 17.5 and 25 percent. *Iowa Utilities Board* v. *Federal Communications Commission*, 1996 U.S. App. LEXIS (8th Cir. 1996).

[35]Harris Rept., *supra*, at 25. See also 1995 AT&T Annual Report at 12 ("AT&T now has 15% of the local business market.").

[36]Earlier this year, AT&T Chairman Robert Allen said that, "A $90 billion local-services market is being opened to competition for the first time. . . . And we think we can win at least a third of that market over the next five to ten years." "Landmark Telecom Bill Becomes Law", The Wall Street Journal, at B3 (Feb. 9, 1996).

[37]"MCI Metro's corporate mission is to become a nationwide provider of a full range of local wire-line services. . . . MCI Metro intends to compete fully with the local exchange carriers and will do that on a facilities-based level and on a resold services based level." MCI Insider Liaison Conference Call report, MCI Metro/Competitive Access Provider Transcript, at 2 (Feb. 1995). See also Gilbert Direct Test. at 12-13("MCI has stated that it plans to begin offering local service in California in July or August 1996").

[38]Gilbert Direct Test. at 20.

[39]Cable, which is designed for video, cannot yet support two way voice and data communications. United States cable companies also lack necessary switching and billing capabilities. Cullari, Divestiture II: Is the Local Loop Ripe for Divestiture, 3 CommLaw Conspectus 157, 179 (1995); Brenner Direct Test. at 16. In the United Kingdom, however, where cable companies use different technologies and where there is no "cross-ownership ban," two-thirds of the households that subscribe to cable reportedly obtain telephone service from the same company. See Affidavit of Glenn A. Woroch, at 30

## 2. __Toll Services__

### a. InterLATA

Interexchange services are telecommunications between a point in one Local Access and Transport Area ("LATA" or "exchange area") and a point located in another exchange area.[40] The MFJ prohibited all the BOCs, including Telesis and SBC, from providing interexchange services.[41] Under Section 271 of the Telecommunications Act of 1996, however, BOCs can now provide both "out-of-region" interLATA communications [42] and, with Federal Communications Commission approval, "in-region" services.[43]

The applicants do not currently provide long distance services. Internal documents indicate that both firms plan to obtain FCC approval for providing in-region service by January 1, 1997.[44] The applicants contend that their merger will increase competition within the long distance market,[45] which they view as a three firm oligopoly.

### b. IntraLATA

IntraLATA services are long distance calls that local carriers could lawfully complete under the MFJ. Thus, in most instances, toll calls within the same area code require intraLATA toll

---

(June 27, 1994), attached to Memorandum of the Bell Companies in Support of Their Motion for a Modification of Section II of the Decree to Permit Them to Provide Cellular and other Wireless Services across LATA Boundaries, *U.S.* v. *Western Elec. Co.,* No. 82-0192 (D.C.C. filed June 20, 1994).

[40]See 47 U.S.C. 153 (a)(42).

[41] For several years after the issuance of the MFJ, it was necessary to dial an access code ("10XXX") if a subscriber wished to place a call through an AT&T competitor. By "presubscribing" to competitive services, users can now access an IEC by dialing "1 plus" the area code of the receiving area exchange.

[42]Subject to certain restrictions on 800 service and private line service, Sections 271(b)(2) and 271(j) of the Act allowed the BOCs to "provide interLATA services originating outside its in-region States after the date of enactment of the Telecommunications Act of 1996."

[43]Section 271(d) provides that the BOC must apply to the FCC for authority to provide in-region originating interLATA services for a particular state. The FCC, which must render a "determination" within 90 days, cannot approve the application unless the BOC has "fully implemented the competitive checklist." Section 271(d)(3).

[44]Twenty percent of the long distance, out-of-region traffic that originates in the Telesis service area terminates in SBC territory. Dorman Trans. at 590.

[45]Dr. Selwyn agrees that the merged company will be a more effective competitor within this market than Telesis, but he doubts that "the merger *per se*" will have any "material impact" on price levels within the long distance market. Selwyn Trans. at 3050, 3058-59, 3062.

services. Until 1995, LECs were the only carriers in California explicitly permitted to complete all types of intraLATA calls.  As is the case for most local operating companies, intraLATA toll services are a major revenue source for both Telesis and SBC.[46]

Telesis business toll revenues have declined significantly, however,  during the past two years.  Because interLATA and intraLATA services are functionally equivalent,[47] long distance carriers faced relatively insignificant barriers[48] when they entered Telesis toll markets.  Moreover, the demand for toll services is geographically concentrated, with 85% of California toll calls originating in urban areas.[49]  Thus, by focusing on the business sector, AT&T and other long distance suppliers forced almost immediate rate reductions of 43 percent, while cutting Telesis's share of business toll revenues to 53 percent.  Residential toll revenues have been more stable, probably because residential users cannot easily adapt to "1+" dialing.[50]

### 3.    **Access Services**

Like other local exchange carriers, Telesis and SBC charge interexchange carriers for making available their facilities in the placement, transport and termination of toll calls.[51]  These fees represent a substantial portion of the revenues generated by both companies.[52]

---

[46]The 1995 SBC Annual Report and the 1996 Telesis Proxy Statement reported that those companies earned $840 million and $1,232 million, respectively, for providing long distance services in 1995.

[47]*Geodesic Network I, supra*, at 3.1.

[48]"Barriers to entry into this market are low."  *IRD*, D.94-09-065, at 22 (Sept. 15, 1994).

[49]Harris Rept., *supra*, at 12.

[50]In contrast, "[t]he fact that some [high volume] customers are willing to use the five extra digits necessary to use an IXC for intraLATA calls shows that 10XXX--`dialaround'--is not a significant obstacle to intraLATA competition for these customers.  Presumably, many of these customers have reprogrammed their PBXs to automatically insert the 10XXX code into the dialed number so it is transparent to the employee making the call."  Harris Rept., *supra*, at 49.

[51] See Dingwall, *Imputation of Access Charges -- A Prerequisite for Effective IntraLATA Toll Competition*, 40 Administrative Law Review 433, 435 (1988) at 434 n.4.  Access services may be switched or dedicated.  "Switched access is accomplished in two steps:   first, the customer is connected to the LEC end office using lines in common with other LEC long distance and local customers; second, the LEC end office is connected to the [long distance carrier]."  See *Competitive Telecommunications Assn.* v. *FCC and United States*, 87 F.3d 522, 524 (D.C. Cir. 1996).  Dedicated, or "special," access is provided on large capacity DS3 lines or smaller capacity DS1 lines that run directly from the customer to the IEC.  *Id.*  It is "dedicated" because only traffic of the individual customer is carried over the line.  D.94-09-065, at 81 (Sept. 15, 1995).

[52]Telesis reported that, in 1995, it earned $2,447 million, or 27 percent of its overall revenues, for providing network access services.  Pacific Telesis Proxy Statement, at F-19 (Mar. 15, 1996).  The corresponding figures for SBC were $3,067 million and 24 percent.  SBC Corporation 1995 Annual Report, at 32.  Sprint spends between 35 and 45 percent of its revenues on access fees.  Dorman Trans. at 582.

Competitive forces and PUC mandates, however, have significantly reduced access rates.[53]   In general, per minute switched access[54] rates in urban areas are significantly greater than the cost to the LEC of providing those services.[55]   Responding to these margins,[56] competitive access providers offer business customers direct access to a long distance company "point of presence" at fixed monthly rates.[57]   The resulting competition reduced California rates for dedicated access, which LECs also offer, by 50% between 1985 and 1991.[58]   In 1994, the PUC also reduced switched access rates by 3 cents per minute.[59]   California origination and termination charges are now among the lowest in the country.

## C.    **Wireless Services**

Telesis does not currently offer wireless services,[60] although the company does own valuable Personal Communications Services ("PCS") licenses for Major Trading Areas" ("MTAs") in

---

[53]See Harris Rept., *supra*, at 32.

[54]"Switched access is the switching transmission service provided by the LECs to connect end-users with IECs and vice versa." D.94-09-065 at 114.

[55]Brenner Direct Test. at 33; Gordon Direct Test. at 28 (Prices exceed long run marginal cost in some urban areas); Dorman Trans. at 583-584 (Telesis "intrastate access charges average about 1.4 cents per minute and . . . [its] interstate access charges average about 1.9 cents per minute.").

[56]MCI concluded that access services generate an operating cash flow margin of 71% for the BOCs.  Operating Cash Flow is a company's Earning Before Interest Expense, Taxes, Depreciation and Amortization (EBITDA).  In 1993, MCI reports, the BOCs generated Operating Cash Flows of $14.7 billion on net revenues of $20.8 billion.  MCI, The Bell Operating Companies' Cash Flow:  A Case Study in Overearnings, at 5 (March 1995).  These figures, however, may fail to account for capital and other associated costs.

[57]AT&T reports that approximately 31.5% of its intraLATA traffic in North Carolina originates on special access facilities.  AT&T Response to Carolina Telephone & Telegraph Company's and Central Telephone Company's First Set of Interrogatories, at Item No. 13 (January 16, 1995).

[58]California Public Utilities Commission Division of Ratepayer Advocates, Report on IntraLATA Competition in California and Program Proposals, Exhibit 559, at 2-4 (Sept. 23, 1991).

[59]"California access charges generally consist of fees for (1) the LEC's switching function done at the end office that supports the user ('end office switching'), (2) transmitting a call from the LEC's end office to the IXC's point of presence ('local transport'), and (3) costs of the access to the LEC's network (`common carrier line charge' (CCLC))".  Siembab, Comment: Opening the IntraLATA Market in California:  Tolls Drop but Casualties Rise, 28 Loy.L.A.L.Rev. 1453, 1465 (1995).  In *IRD*, the PUC "lowered IEC switched access costs by eliminating the CCLC [Common Carrier Line Cost] and reducing the access and transport charges the LECs collect from IECs.  These reductions are substantial and average about three cents per minute."  *IRD*, *supra*, D.94-09-065 at 132.

[60]In 1994, Telesis divested its cellular operations, which now do business as Airtouch Corporation.  For a summary of the financial effects on Telesis of the "spin off," see Pacific Telesis 1995 Proxy Statement at F-24.

southern California and Nevada and northern California and Nevada.[61]   In contrast, SBC describes itself as one of the leading cellular companies in the United States,[62] but it has no wireless properties in California.   The applicants contend that SBC industry leadership will ease entry into California's increasingly competitive wireless market.[63]

## III.   COMPETITION AND RATE REGULATION AT THE LOCAL EXCHANGE

The California telecommunications industry reflects hybrid regulatory and rate structures for toll, local, and access services.   Until recently, regulatory constraints prohibited local telephone companies from providing services in other exchanges.   During the past three years, however, the PUC expanded competition for direct access services, opened the intraLATA toll market to long distance carriers,[64] and encouraged competitive entry into local business and residential exchange services.[65] The Telecommunications Act of 1996 theoretically opened all other protected telecommunications markets.[66]   These deregulatory efforts, however, have been mitigated somewhat by universal service policies designed to provide "affordable" rates to virtually all residential customers.[67]   In some instances, the Commission has also considered financial viability in its rate-making proceedings.

The PUC establishes the rate or rate structure for a particular service by assessing the competitiveness of the market in which it is supplied and, in some instances, its production or accounting costs.   The Commission divides all telecommunications services into three categories. Category I consists of services offered in monopolized markets.[68]   This category includes basic

---

[61] Pacific Telesis Group, Quarterly Report to Shareholders, at 3 (March 31, 1995).   Telesis obtained the southern California and Nevada MTA with a bid of $493.5 million and the northern California and Nevada MTA with a bid of $202 million.   *Id.*   Those MTAs are the second largest and fourth largest license areas in the country.   *Id.* Telesis plans to introduce PCS services in the San Francisco Bay Area in the near future.   *Id.*

[62] Stupka Direct Test. at 14.

[63] See Stupka Direct Test. at 14-18.

[64] D.94-09-065 (Sept. 15, 1994).

[65] See D.95-07-054; D.95-12-056.   In those decisions, the PUC authorized entry by "facilities-based" competitive local carriers (CLCs) on January 1, 1996 and by resellers on March 1, 1996.

[66] Section 253(a) of the Telecommunications Act of 1996 forbids all state and local agencies from "prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."   See also Selwyn Direct Test. at 49 n.56.

[67] D.94-09-065, p. 34.   The PUC has concluded that Pacific and GTE should "achieve a 95% penetration rate for phone service" among low income, nonwhite, and non-English speaking households.   *Id.*, pp. 6-7.

[68] Other Category I services include Semipublic telephone, public coin, customer owned pay telephone access line, operator services - 911, basic service elements, intraLATA directory assistance, local measured usage, zone unit measurement, extended area service, foreign exchange, foreign prefix, and multiple line call detail.   *Id.* at 283.

exchange[69] and switched access[70] services.  Category II consists of intraLATA toll, dedicated access and other "partially competitive or discretionary services."  Category III consists of "fully competitive" services, such as information and Yellow Page directory services.  The PUC does not regulate the rates of Category III services.

Category I and Category II services are subject to price cap regulation, however, because LECs supplying those services have market power.  Under price cap regulation, which is designed to address cross-subsidization incentives,[71] the Commission theoretically sets the "initial rate" for each service at its direct embedded costs[72] (DEC).[73]  In subsequent years, prices decline at a rate equal to the difference between a productivity factor ("X") and the Gross Domestic Product Price Index (GDPPI).  One-time exogenous cost changes, which are outside the control of the supplier,[74] are separately accounted for with a "Z" factor.  Suppliers of Category II services also have "pricing flexibility," meaning they may charge any amount between the cap and the appropriate "price floor," which is the lower of the DEC or LRIC for the service.[75]

The rates actually charged do not, however, mechanically conform to these guidelines.  For example, in 1994, the Commission raised Pacific's residential flat rate service from \$8.35 to \$11.25,[76] even though the DEC for that service significantly exceeded that amount.[77]  Instead, to promote universal service principles,[78] the Commission set the rate at one-half of the difference between the fully allocated cost of that service (FAC)[79] and its federally mandated end-user common

---

[69]*Id.*, at 34.

[70]*Id.* at 116.

[71]*Re Alternative Regulatory Frameworks for Local Exchange Carriers*, 33 CPUC 2d 43, at 105-10, 145 (D.89-10-031, 1989).   See also Cal. P.U. Code §2282.5.

[72]"Direct embedded costs are historical costs recorded in the LECs' books of accounts and allocated to specific services.  DECs do not include any common overhead costs, only costs that may be directly assigned to the service." D.94-09-065, *supra*, at 32.

[73]D.94-09-065, *supra*, at 34, 315.

[74]See D.89-10-031, 33 CPUC 2d 42, 161-62 (1989).

[75]*Id.*, at pp. 33-34.

[76]*Id.*, at p. 41.

[77]In 1994, the Commission found that the DEC for business service was \$15.00, and Pacific's FAC for basic service was \$26.00.  D.94-09-065, *supra*, at pp. 45, 49.  Similarly, Harris found that the "real price of Pacific Bell's basic exchange service" was \$14.75 in  1995.  Harris Rept., *supra*, at p. 2.

[78]P.U. Code Sections 873 and 874 require the Commission to set rates for low-income residential customers at no more than 50% of the basic rate for either flat rate or measured rate service.

line (EUCL)[80] charge of $3.50 per month.  During the same proceedings, the Commission reduced switched access rates by three cents.[81]  Likewise, intraLATA service rates fell by 43 percent after the Commission permitted long distance suppliers[82] to enter that market in 1994.  Telesis revenues from dedicated access services also fell during that period.

The Commission has also revised the price cap formula itself.  In 1995, Pacific filed an "emergency petition" for complete elimination of that form of regulation.  Telesis based its motion upon evidence that the formula's mandated price reductions had already impaired the financial performance of the company[83] and that, unless replaced, the formula would have even stronger effects upon the ability of Telesis to compete in the future.[84]  In addition, Telesis contended, "Pacific had already achieved the easy gains by becoming highly efficient"[85] and that further price reductions for those already below cost Category I services would be economically inefficient.[86]  Finding that the Price Cap formula "can present an obstacle to the LECs in the capital markets and the ability of LECs to finance infrastructure,"[87] the PUC set the productivity factor equal to the prevailing rate of inflation.

## IV.  **THE COMPETITIVE EFFECTS**

The issues raised by this merger are very similar to those we addressed in our 1993 review of the GTE-Contel transaction.  As there, the applicants do not compete in any California markets.  Both firms also currently offer or plan to offer local telephone and wireless services.  Furthermore, there is no evidence that SBC has any current effect upon Telesis operations.  Unlike GTE and Contel, however, the applicants are not legally prohibited from competing.  Accordingly, under the "actual potential competition" doctrine, it is necessary to determine whether, absent the

---

[79]The FAC of a service is equal to its DEC plus an allocation of common overhead costs.  D.94-09-065, *supra*, at pp. 32-33.

[80]*Id.*, at p. 44.

[81]*Id.*, at p. 132. The Commission attributed much of that reduction to its elimination of the common carrier line charge (CCLC).  *Id.* at pp. 114-21.

[82]The Commission prohibited LEC-to-LEC competition, however, because  of its "fear . . . that Pacific may acquire a substantial portion of GTEC's business, even without presubscription.  The loss of this revenue could severely harm GTEC."  *Id.* at pp. 24-25.

[83]See *id.* at pp. 54-71.  Telesis also introduced evidence that the appropriate X factor was actually 2.1%, not the 5% presumed by the Commission, and that telecommunications markets are increasingly competitive.

[84]*Id.*, at pp. 40-44.

[85]*Id.*, at p. 59.

[86]*Id.*, at p. 14.

[87]*Id.*, at p. 60.

merger, SBC would compete with Telesis and whether SBC entry would have significant procompetitive effects. Like *GTE-Contel*, it is also necessary to determine whether the consolidation could enhance the ability of the merged firm to anticompetitively cross-subsidize its competitive operations.

### A.    The Standard of Review and the Relevant Markets

Traditionally, the competitive effects of a proposed merger are analyzed by a well-developed model that seeks to measure effects of the consolidation within some "relevant market." This model predicts competitive effects for those consolidations where market forces determine price and output levels. A merger necessarily has no effects upon competition, however, in markets where the regulatory scheme has already "displaced" competition.[88] It is at least theoretically possible, nonetheless, that a merger of firms offering both types of services could affect the interactions between the regulated and unregulated operations of the parties.

The traditional model for assessing effects within unregulated markets begins with the characterization of each relevant product market affected by the merger. This model is embodied in the analytically similar horizontal merger guidelines developed by the Department of Justice and Federal Trade Commission ("DOJ/FTC Merger Guidelines") and the National Association of Attorneys General ("NAAG Merger Guidelines").[89] The product market refers to the range of products or services that are or could[90] easily be made relatively interchangeable, so that pricing decisions by one

---

[88]*City of Lafayette* v. *Louisiana Power & Light Co.*, 435 U.S. 389 (1978).

[89]Dr. Selwyn refers to the standard set forth in the DOJ/FTC Merger Guidelines as "extremely narrow." Selwyn Direct Test., *supra*, at 150. He believes, in particular, that the Guidelines approach "fails to account for the way in which telecommunications markets are evolving, both in California and nationally." *Id.* at 154. This office does not share Dr. Selwyn's view of the Guidelines. See, e.g., Pitofsky, *New Definitions of Relevant Market and the Assault on Antitrust*, 90 Columbia L.Rev. 1805, 1822 (1990)("The Department of Justice Guidelines, and in particular the portions dealing with market definition are a formidable achievement"); Baker & Blumenthal, *The 1982 Guidelines and Preexisting Law*, 71 Calif. L.Rev. 311, 322 (1983)(market delineation approach is "their most important contribution"); Ordover & Willig, *The 1982 Department of Justice Merger Guidelines: An Economic Assessment*, 71 Calif. L.Rev. 535, 539 (1983) (market definition approach was a "noteworthy intellectual feat").

[90]The Justice Department and the courts apply slightly different standards to determine the range of supply substitutes to be included within the relevant market. The courts generally include supply substitutes within the relevant market but they sometimes "include the products to which firms selling the particular product could substitute in supply, rather than, or in addition to, the products produced by firms that do not currently sell the particular product but that could begin doing so by substituting in supply." Werden, *Market Delineation under the Merger Guidelines: a Tenth Anniversary Retrospective*, 38 Antitrust Bull. 517, 525-26 (1993).

The DOJ/FTC Merger Guidelines distinguish between "uncommitted entrants" and other types of "supply responses." Thus, the Guidelines include within the relevant market those "potential competitors" which could shift their facilities "easily and economically" to sell in the relevant market within one year in response to a hypothetical price increase. DOJ/FTC Merger Guidelines, *supra*, at §§1.3, 3.0 n.25. Future supply effects are considered separately. See Pitofsky, *supra*, at 1860; Werden, *supra*, at 525, 529 ("the Guidelines' definition of an antitrust market reflects the separation of demand substitutability . . . from supply substitutability and entry, which are considered in later steps in the analysis.")

firm are influenced by the range of alternative suppliers available to the purchaser. The analysis then proceeds to a determination of the relevant geographic market, which is defined as the area in which the sellers compete and in which buyers can practically turn for supply.[91]

In some merger cases, the temporal dimension of the market must also be considered.[92] The ability of economic science to accurately predict demand or supply conditions within an existing market is limited. Predictions about new *types* of goods that will be both desired by consumers and actually supplied by firms in the future are considerably more speculative.[93] To avoid such speculation, the Merger Guidelines assess the hypothetical effects of a "price increase of five percent lasting for the foreseeable future." DOJ/FTC Merger Guidelines, *supra*, at §1.11. For similar reasons, we limit the product markets that we consider here to the range of local, intraLATA toll, access,[94] information and other competitive services *currently* offered[95] by both of the merging parties and sold by Pacific Bell in California.[96] In some instances, the analysis is further clarified by distinguishing between business and residential services.[97]

---

[91]*U.S.* v. *Connecticut National Bank, supra*, 418 U.S. 656, 668 (1974).

[92]See *BOC Int'l Ltd.* v. *FTC*, 557 F.2d 24, 29 (2d Cir. 1977)("[It] seem necessary under Section 7 that the finding of probable entry at least contain some reasonable temporal estimate   related to the near future with 'near' defined in terms of the entry barriers and lead time necessary for entry in the particular industry, and that the finding be supported by substantial evidence in the record."); Pitofsky, *supra*, at 1832.

[93]Gilbert Trans. at 679-81.

[94]Dr. Gilbert treated access as part of the local service market. Gilbert Trans. at 668-71. CAPs can now compete for dedicated access services. As we discuss below, interconnection agreements will also enable long distance suppliers to compete for "high-valued" residential and business switched access services. See Section IV.B.3., *infra*.

[95]See Pitofsky, *supra*, at 1835 (advocating focus upon "currently available products"). We are not aware of any litigated Section 7 action in which the merger would have allegedly restrained trade in a product market that did not exist prior to the merger.

[96]Likewise, we refrain from attempting to forecast effects upon competition in markets for services that are not now available. ORA suggests that the relevant product could comprise a "cluster" of "products and services, which may include local exchange, intraLATA and interLATA toll, international, wireless, internet, and cable television, and that may encompass a larger geographic scope than the confines of a single state." Selwyn Direct Test. at 155.

In fact, "[n]o one currently knows which system or systems will be technologically and financially viable in the foreseeable future. Although it is regularly reported in the business press that a 'convergence' of telecommunications technologies is occurring, it may actually be the case that a *divergence* of such architectures may simultaneously evolve for the delivery of various combinations of narrowband and interactive broadband services." Crandall & Sidak, *Competition and Regulatory Policies for Interactive Broadband Networks*, 68 So. Cal. L.Rev. 1203, 1204 (1995). Thus, confident predictions about the future availability or unavailability of telecommunications products are routinely proven incorrect. See, e.g., "Bell Calls on AT&T Executive to Pay Up or Pipe down on Rival," The Wall Street Journal, at B1 (Dec. 17, 1996) (reporting that AT&T executive "bet a month's wages" that a joint venture which recently began offering service "would utterly fail to meet its oft-repeated goal of launching competing [wireless] services in 11 U.S. markets by Christmas"); "For Nextel, '94 Was Best of Times and Worst of Times", The Wall Street Journal (Jan 5, 1995)( "A late 1993 forecast by Merrill Lynch analyst Linda Runyon suggested that Nextel could sign up more than  400,000 new wireless customers in 1995 alone and possibly triple that in four years.  Nextel today has 15,000 digital subscribers.")  See also "rosy market share predictions", cited in Opening

The competitive effects of a merger between suppliers operating within the same relevant markets depend upon several related factors, including changes in concentration levels,[98] entry conditions,[99] and efficiency enhancements.[100] On the other hand, where the acquiring firm is a potential supplier to a concentrated relevant market, the competitive effects depend upon whether the acquiring firm is or is likely to be a destabilizing force within that market.[101]

---

Brief of AT&T Communications of California, at 33.

[97]As Dr. Gilbert recognizes, the relevant product and geographic markets can be "fragmented," Gilbert Trans. at 672, so long as there is a "gap in the chain of substitutes." See Hausman and Tardiff, *Efficient Local Exchange Competition*, 40 Antitrust Bull. 529, 535 (1995) ("Subscriber access services used by large business customers and residential customers comprises different markets because in the former case there are numerous substitutes . . . that would have to be included in the hypothetical monopolist's product offerings . . ., while . . . in the case of residential access services the market definition test might be passed with only basic access service in the product market definition.")

In general, "There is a range of possible markets of varying breadth that can be used in an antitrust case. A broad market is one in which distant substitutes for the product of the firm whose market power we are trying to measure are included. A narrow market is one where only close substitutes are included. The choice is largely immaterial so long as it is recognized that the market elasticity of demand varies inversely with the breadth of the market." Landes and Posner, *Market Power in Antitrust Cases*, 94 Harv. L.Rev. 937, 978 (1981). See also Schmalensee, *On the Use of Economic Models in Antitrust: The ReaLemon Case*, 127 U.Pa.L.Rev. 994, 1010 (1979) ("the appropriate degree of aggregation depends almost entirely on the question to be analyzed," . . . but "a noticeable 'gap in the chain of substitutes'" is required). AT&T claims notwithstanding, relevant markets cannot be defined with Mosaic certainty. See Opening Brief of *AT&T Communications*, at 21.

[98]Market share statistics for regulated industries must be applied with particular care: "Market share is but one determinant of market power. . . . A 'high' market share in a regulated industry undergoing a transition to competition may mean nothing in terms of market power, since it may be but an artifact of the past, devoid of information concerning a regulated firm's actual ability to control current prices." Larson, *An Economic Guide to Competitive Standards in Telecommunications Regulation*, 1 CommLaw Conspectus 31, 43 (1993). See *Metro Mobile CTS, Inc.* v. *New Vector Communications, Inc.*, 892 F.2d 62, 63 (9th Cir. 1989); *Entergy Services Inc.*, 64 F.E.R.C. 61,001 (1993). See also Watson & Brunner, *Monopolization by Regulated "Monopolies": The Search for Substantive Standards*, 22 Antitrust Bull. 559 (1977).

For example, entry conditions for long distance companies, not market share figures, most accurately represented competitive conditions in the business intraLATA toll market immediately after the Commission opened that market to competition. As noted above, entry by long distance firms forced rapid price reductions and ended Pacific Bell's previously overwhelming dominance in the market.

[99]See *McCaw Personal Communications, Inc.* v. *Pacific Telesis Group*, 645 F.Supp. 1166, 1174 (N.D. 1986).

[100]See *FTC* v. *University Health, Inc.,* 938 F.2d 1206, 1222 (11th Cir. 1991); *Broadcast Music, Inc.* v. *CBS*, 441 U.S. 1 (1979) (joint venture).

[101]The 1984 DOJ Guidelines separately treat acquisitions of potential competitors and vertically-related firms as non-horizontal" mergers. The DOJ/FTC Merger Guidelines do not discuss non-horizontal mergers. See *U.S. Dep't of Justice & Fed. Trade Comm'n, Statement Accompanying Release of Revised Merger Guidelines* (1992), reprinted in 57 Fed. Reg. 41,552 (1992). The later guidelines, however, did not affect or change any former policies regarding non-horizontal mergers.

Mergers that create firms doing business in both regulated and unregulated markets, such as the 1984 GTE-Sprint transaction,[102] may also expand or facilitate opportunities for the surviving firms to cross-subsidize their competitive services.[103] The determinative question raised by any merger is whether the consolidation will enhance the ability of the firm to raise prices or reduce output. Thus, a regulated firm merging with an unregulated company in a related line of business could indirectly acquire a degree of control over its rates because the surviving firm might "be able to slip [cost] misallocations by the regulators . . . from [its] competitive business to [its] monopoly service."[104] These cross-subsidization incentives can exist even under "price cap" systems of regulation if the X factor adjustments are designed to provide the firm with a guaranteed return on its capital.[105]

## B. Potential Competition

Even though Telesis and SBC do not compete in any California telecommunications market, AT&T claims that the merger will reduce competition by eliminating SBC as a possible supplier in future markets[106] for local and other services.[107] As the applicants accurately note, however, there is no significant evidence that SBC will actually enter any of these markets if this merger is not approved. Moreover, AT&T, MCI, Sprint, Metropolitan Fiber Systems, Brooks Fiber, TCG, ICG and other major firms[108] now compete with Telesis in markets where entry is viable and

*Id.* As a result, the Department of Justice still views the 1984 DOJ Guidelines as the appropriate standard for analyzing mergers between potential competitors. *Id.*

[102]*U.S.* v. *GTE Corporation*, 1985-1 Trade Cases  66,354 (D.D.C. 1984)("*GTE Decree Decision*")

[103]AT&T and MCI contend that the merger will adversely affect competition because universal service objectives skew applicants' cost and pricing decisions. They note that access rates exceed costs in both California and Texas. Accordingly, the profit-maximizing price for long distance services between those states may be lower for the merged company than for long distance suppliers. See Brenner Direct Test. at 33-35. If so, consumers will benefit from the price reductions that may result from the merger. In any event, the relative disadvantage that long distance carriers may face in this market results from regulatory decisions to cross-subsidize local service, not from the merger itself. See Dorman Trans. at 591.

[104]See Breyer, *Antitrust, Deregulation, and the Newly Liberated Marketplace*, 75 Cal. L.Rev. 1005, 1040-41 (1987).

[105]J. Vickers and G. Yarrow, *Privatization: An Economic Analysis*, at p. 207 (MIT Press, 1988).

[106] AT&T contends that "the Commission's real focus must be on whether the acquisition adversely impacts the *development* of competition." Opening Brief of AT&T at 19. UCAN apparently proposes a similar standard. See Binz Direct Test. at 24, 26. We limit our analysis here to the more narrow prediction of whether a specific firm, SBC, *would* enter the relevant markets in the *near* future.

[107]An AT&T document, however, concedes that "[t]he merger between SBC and Pacific Telesis does not change the existing competitive landscape in any way." Gilbert Exhibit C31, vol. 1, tab 11, page ATT 0031550. Similarly, Dr. Selwyn states that "the merger probably does not violate [the Guidelines]." Selwyn Trans. at 3130.

[108]Gilbert Trans. at 703-09, 907. See also Brenner Trans. at 3302.

they are all planning to aggressively expand the range of that competition. Because SBC is neither an actual potential competitor nor a perceived potential competitor, we conclude that the elimination of SBC as a possible future supplier will not have any appreciable effect upon price or output levels in any market for telecommunications services within this State.

### 1. The Actual Potential Competitor Doctrine

A merger between two firms that offer the same products in different geographic markets can have two types of anticompetitive effects. First, the presence of the acquiring firm on the "fringe" of a target firm's insufficiently competitive market may "temper" pricing behavior there. The "perceived potential competition" doctrine views such mergers as illegal because they have adverse effects upon current prices within the target market. In this case, however, there is no evidence that SBC, the acquiring firm, has any effect whatsoever on pricing or output levels within California's "target" telecommunications markets.

Nonetheless, the merger may still have adverse competitive effects if SBC would have otherwise entered California markets in the foreseeable future and if that entry would have had "procompetitive" effects within those markets. Following *Marine Bancorporation*, the courts[109] have specified three preconditions to the application of the "actual potential competition" theory.[110] First, the target market must be concentrated, thus establishing a prima facie case of noncompetitive behavior by the existing competitors.[111] Second, the acquiring firm must be a probable market entrant. Third, the hypothesized future entry must have significant procompetitive effects.[112]

### 2. SBC Entry into California Markets.

The probable entry requirement is particularly difficult to establish. To avoid speculation,[113] the courts consistently require proof that the acquiring firm "would"[114] --not

---

[109]"While the Guidelines recognize two separate theories of potential competition injury -- actual and perceived potential competition -- and declare that both are to be protected, they do not treat the two effects as separate doctrines, as has been the tendency under the case law." Brodley, *Potential Competition under the Merger Guidelines*, 71 Cal. L.Rev. 376, 387 (1983).

[110]The doctrine is highly controversial. Thus far, "the government has been unable to sustain its burden of proof in any actual potential competition case." Brodley, *supra*, at 378. One observer has thus rejected the doctrine as unworkable. See Carter, *Actual Potential Entry under Section 7 of the Clayton Act*, 66 VA L.Rev. 1485 (1980). Areeda, likewise, questions whether the doctrine provides a basis for a Section 7 violation. Areeda and Hovenkamp, Antitrust Law §1118 (Supp. 1996) ("Where the outside firm is relevant only because it might otherwise enter in the future and thereby increase competition at that time, the merger does not reduce competition but only eliminates a future opportunity to increase it.")

[111]*Marine Bancorporation*, *supra*, at 630-32.

[112]See Pitofsky, *Proposals for Revised United States Merger Enforcement in a Global Economy*, 81 Georgetown L.J. 195, 203 (1992).

[113]The Supreme Court limits the analysis to "probabilities," not "ephemeral possibilities." *Marine Bancorporation*, *supra*, 418 U.S. at 622-23. See also *BOC Int'l Ltd.* v. *FTC*, 557 F.2d 24, 29 (2d Cir. 1977)(rejecting a finding of "eventual" entry as "uncabined speculation").

"could"[115]--have entered the target market *de novo* or through a "toehold" acquisition,[116] absent the merger.[117]  Moreover, they require a showing that entry will occur, not in the "reasonably foreseeable" future, but in the "near" future.[118]

Neither type of evidence is available here.  Internal documents do not demonstrate any intention by SBC to enter California markets on an independent basis or toehold basis.[119]  In fact, those documents indicate that entry into California would conflict with established SBC investment strategy.  That strategy limits SBC investment to telecommunications markets in which SBC already has network facilities, customers, and brand name recognition.  None of those factors are present in California.[120]  SBC would also have no clearly identifiable competitive advantage within this market.  In fact, AT&T,

---

[114]*BOC Int'l*, *supra*, 557 F.2d at pp. 27-28.

[115]*Mercantile Texas Corp.* v. *Board of Governors of the Fed. Reserve Sys.* 638 F.2d 1255, 1268 (5th Cir. 1981). Nonetheless, Dr. Brenner poses the issue as whether "SBC would be among the entrants that *could* compete effectively with PTG local service and contribute to the development of competition."  (Emphasis supplied.)  Brenner Direct Test. at 14.  See also Opening Brief of *MCI Telecommunications Corp.*, at p. 7 ("SBC would be a *likely* entrant"), 9 ("There is Ample Evidence that SBC *Could* Have Entered the California Local Exchange Market").

[116]AT&T makes the tautological argument that the fact of the merger demonstrates probable entry.  Opening Brief of AT&T, at 9.  The pertinent question, however, is whether the acquiring firm, SBC, would have otherwise enhanced competition within the relevant market, either through *de novo* entry or through a "toehold" acquisition.  *Marine Bancorporation*, *supra*, 418 U.S. at 602.  The courts, in fact, reject as speculation actual potential competition claims that lack evidence of a specific intent to enter independently or through the expansion of a small, existing firm, even where there is "abundant evidence" of both the "interest" and "incentive" to acquire a leading firm in the industry.  See *Tenneco, Inc.* v. *F.T.C.*, 689 F.2d 346, 353 (2d Cir. 1982).

[117]Citing the *Falstaff* decision, Dr. Selwyn contends that "under Supreme Court precedent," an absence of intent to enter the California market is not dispositive.  Selwyn Direct Test. at 157, citing  *U.S.* v. *Falstaff Brewing Corp.*, 410 U.S. 526, 533 (1973).  The *Falstaff* language Dr. Selwyn cites, however, is dictum not followed by any court in the past 23 years. In *Tenneco*, for example, the absence of subjective intent evidence was dispositive.  *Tenneco* v. *F.T.C.*, 689 F.2d 346 (2d Cir. 1982).  In another case, the Federal Trade Commission concluded that the "best evidecne concerning the incentives of the acquiring firm to enter independently . . . is likely to be subjective."  *B.A.T. Indus.*, 104 F.T.C. 852 (1984).

[118]*Republic of Texas Corp.* v. *Board of Governors of the Fed. Reserve Sys.*, 649 F.2d 1026, 1047 (5th cir. 1981) (demonstrating entry in the "reasonably foreseeable future" was insufficient); *BOC Int'l*, *supra*, 557 F.2d at 29.

[119]Dr. Brenner testified that, in his review of SBC materials, he had "not seen documents that had a specific intent, focused specifically on California."  Brenner Trans. at 3265.  AT&T apparently agrees, noting that "SBC's business plans do not state an intention to enter California before [passage of the Telecommunications Act of 1996]."  Opening Brief of AT&T Communications of California, at 15.  Similarly, Dr. Gilbert testified that, in his review of AT&T documents that referred to RBOCs as potential competitors, he "saw no reference to SBC as a provider of facilities-based competition."  Gilbert Trans. at 1089.

[120]One court required "a persuasive rationale" demonstrating that the acquiring firm would prefer entry over other opportunities for investment or expansion.  *Republic of Tex. Corp.*, *supra*, 649 F.2d at p. 1047.

which uses a similar investment strategy, does not even list SBC among the likely potential suppliers of local exchange service in California.[121]

### 3. Competitive Effects of Independent SBC Entry.

For the actual potential competition theory to apply, entry must also have a deconcentrating or other significant procompetitive effect.[122] This predicate effect will not exist "if there are numerous potential competitors," however, because the elimination of one of many "would not be significant."[123] Similarly, the doctrine will not apply if the market is already competitive or if regulation has negated otherwise available procompetitive effects of alternative entry. Thus, in *Marine Bancorporation*, the Supreme Court found that because of restrictions on bank expansions, even feasible entry offered "little realistic hope of ultimately producing deconcentration" or of having "any meaningful effect on the economic behavior of the large Spokane banks."[124]

If SBC entered California telecommunications markets, it would face strong competitors in the markets for intraLATA toll, dedicated access, and some facilities-based[125] basic

---

[121]Gilbert Reply Test. at 13-14. AT&T and MCI suggest that a merger is anticompetitive if it eliminates one of many suppliers for which entry would be feasible. Brenner Direct Test. at 13-14. Feasible entry is certainly a prerequisite to the application of the actual potential competitor doctrine. Carter, *supra*, at 1499. Absent a showing that entry is *in fact* likely, however, there is no basis for concluding that the acquiring firm would have had a disruptive, procompetitive effect within the relevant market. *Carter*, *supra*, at pp. 1500-01.

[122]Brodley, *supra*, at 379; *Republic of Tex. Corp.*, *supra*, 649 F.2d at 1047.

[123]*Mercantile Texas Corp.*, 638 F.2d at p. 1267. See also *U.S.* v. *First National State Bancorporation,* 499 F.Supp. 793, 814 (D.N.J. 1980)

[124]*Marine Bancorporation*, *supra*, at 636-37.

[125]Local services represent combinations of "building blocks" or "unbundled elements." The Telecommunications Act of 1996 attempts to promote competition by allowing new entrants to construct new facilities, use unbundled elements, or employ resale. *First Report and Order*, *supra*, ¶¶12-13. Full competition for telephone services is possible if those building blocks are sold at their "total service long run incremental costs" (TSLRIC). Gilbert Trans. at 909.

Thus, long distance carriers can offer switched access services by combining Pacific Bell "loops" with their own switching facilities. Pacific Bell recently entered into interconnection agreements with both AT&T and Sprint. Under its agreement, AT&T can purchase unbundled "weighted 2-wire basic link", local loop services for $12.82 per customer. Agreement between Pacific Bell and AT&T Communications of California, Inc., at Attachment 8, Appendix A (P.U.C. App. 96-08-040, filed Dec. 19, 1996). As a result of another such plan, MCI customers can now obtain unlimited monthly local services anywhere within the extensive LATA serving Los Angeles, Oxnard, Anaheim and Bishop for $24.95. Thus, all three of the major long distance carriers will soon be able to provide long distance access services through their own facilities. Markets for local service and switched access will develop and become increasingly competitive as alternative suppliers offer substitutes for Pacific Bell service elements.

Market participants are not limited, therefore, to suppliers in the retail and wholesale markets. Dr. Brenner correctly noted that "The wholesale price the reseller pay to buy Pacific Bell service, together with the reseller's other costs, determines the absolute floor on the price the reseller can charge and earn a profit. The reseller can put virtually no competitive pressure

business services. AT&T, MCI, and many other major firms have existing plans to enter profitable markets currently served by Telesis.[126] There is no basis for concluding that future SBC entry would substantially increase the level of competition beyond that provided by these other entrants. On the other hand, mandated below-cost rates would preclude profitable facilities-based entry by SBC into many markets for residential local services.[127]

## C. Cross-Subsidization

The merged firm will have substantial operations in both regulated and unregulated markets. In fact, one of the principal goals of the merger is to increase investment in competitive California telecommunications markets. Unlike *GTE-Sprint*, this merger will not by itself enhance opportunities for anticompetitive cross-subsidization between these sectors. Even so, under cost-based pricing for regulated services, the merged entity might have an incentive to drive rivals out of certain competitive markets by pricing those services below cost, and allocating part of the cost differential to its regulated operations. To minimize these incentives, we recommend that the Commission maintain a stable system of price cap regulation.

## 1. Cross-Subsidization in Long Distance and other Telecommunications Markets

Cross-subsidization occurs when a firm with a common capital facility uses revenues from one service to finance a portion of the cost of producing a second service.[128] A firm regulated to "break even" employs cross-subsidies if the revenues generated by either of two services exceeds the "stand-alone" cost[129] of providing that service. Conversely, the firm is free of cross-subsidies if the revenues generated by each service cover the incremental cost of providing that service.[130] For example, to promote universal service objectives, the Commission requires Pacific and other LECs to

on the wholesale price at which Pacific Bell supplies service, in the way that a competing producer of service might." Brenner Direct Test. at 23-24. See also *Geodesic Network II*, *supra*, at 3.7 ("resellers add little independent competitive value; they are by and large arbitrageurs, exploiting dislocations in imperfectly competitive markets.") He failed to describe, however, the full extent of competition within the market.

[126]See discussions in preceding note and Section II.B. Dr. Brenner believes that potential competitors in California local exchange markets served by Pacific Bell include: GTE, AT&T, MCI, Sprint, MFS, Teleport, ICG, Brooks Fiber, and "all seven RBOCs". Brenner Trans. at 3131-32, 3230. He also concedes that all of them, except for the BOCs, have facilities that could be used to provide local exchange services in California. *Id.* at 3302-3303.

[127]See Gordon Rebuttal Test. at 5, 28.

[128]Larson, Monson, and Nobles, *Competitive Necessity and Pricing in Telecommunications Regulation,* 42 Fed. Comm. L.J. 1, 12 (1989).

[129]The stand-alone cost of a service is the cost to an efficient independent entrant of providing that service alone. Larson, Monson, and Nobles, *supra*, at 13 n.38.

[130]For discussions of these criteria, see Temin & Peters, *Cross-Subsidization in the Telephone Network*, 21 Willamette L.Rev. 199, 205-10 (1985); Larson, Monson and Nobles, *supra*, at 18-20.

cross-subsidize high cost with low cost service areas.[131]   Similarly, Pacific cross-subsidizes residential local services with business access services.

Cross subsidies can be anticompetitive under *cost-based* regulation if a firm with market power uses them to drive rivals out of a market.[132]   A firm can price a competitive service below cost to the extent it is allowed to treat the cost of providing that service as a recoverable expense of the regulated sector.  Suppliers which sell only the competitive service may be unable to match this cross-subsidized price and may, therefore, be forced to leave the market.[133]   Like "predatory" pricing, the practice does not have adverse competitive effects unless the firm can reasonably expect to prevent future competitive reentry while it "recoups" profits lost during the predation stage.[134]

For that reason, LECs could not profitably use cross-subsidies to monopolize long distance markets.  Many of the costs of providing local service are incurred jointly with the provision of long distance service.  The merged company proposed here could, thus, hypothetically use cross-subsidies to temporarily force AT&T and other suppliers to exit certain long distance markets.[135] The company could not recoup its investment in its market position, however, because AT&T, MCI, and Sprint and other well-financed suppliers could easily reenter these markets as soon as prices again

---

[131]D.94-09-065, at 35-36 (Sept. 15, 1994).

[132]"Cross-subsidization is relevant . . . insofar as it may used to price below cost in the competitive market, and thereby unfairly acquire power and impede competition in that market."  *U.S.* v. *Western Electric Co.*, 900 F.2d 283, 297 (D.C. Cir. 1990).

[133]Thus, some observers contend that cross-subsidization is not a feasible practice in the telecommunications industry because (1) telephone companies are generally not allowed to earn rates of return that exceed the market cost of capital and (2) telephone companies' rates of return do not always stay at even the allowed rate of return.  Larson, Monson, and Nobles, *supra*, at 15.

This analysis is incomplete.  "[P]redation cannot be a successful strategy under price caps in the short run. . . . Price caps can, however, reduce the cost of predation.  Thus predation is more likely under price caps than in an unregulated private market, but it is less likely than under standard [cost-based] regulation.  For this reason, it is important to segregate competitive and monopoly services under a price-caps regime, keeping competitive services out of the regulatory regime altogether."  Crandall & Waverman, *Talk is Cheap: The Promise of Regulatory Reform in North American Telecommunications*, at 113 (Brookings Institution, 1995).

[134]*Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) ("Recoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation.")

[135]Mr. Fellmeth asserts that, in *U.S.* v. *AT&T*, "predatory practices of the defendants were well documented in the court record, and are reflected in Judge Greene's extensive findings of fact."  Fellmeth Direct Test. at 6.  In fact, the evidence presented at trial did not establish whether local or interexchange services were the source or beneficiary of cross-subsidies, or if any cross-subsidies existed within the AT&T network at all.  See Temin & Peters, *supra*, at 202-05.  Thus, Judge Greene concluded that, "Since the trial was aborted by the settlement, no final decision was reached on this issue."  *MFJ*, *supra*, 552 F.Supp. 169 n.160.  Moreover, we are not aware of any telecommunications supplier -- including both Telesis and SBC -- which has been found to have cross-subsidized one of its services in restraint of trade.  See letter from James Young to Lindsay Bower (Dec. 12, 1996) and letter from Paul K. Mancini to J. Lindsay Bower (Dec. 11, 1996).

rose above production costs.[136]  As we have noted elsewhere, regulatory constraints[137] also preclude anticompetitive cross-subsidization of long distance operations.[138]  Accordingly, we continue to support efforts by Telesis to enter the long distance markets and we oppose the conditions on SBC long distance entry proposed in these proceedings.[139]

Even so, there may be other services which can be anticompetitively cross-subsidized. Telecommunications services are highly interdependent and the networks that provide them are almost infinitely complex.  For that reason, it is extremely difficult to ascertain the economic (long run incremental) cost of providing any single service.[140]  For the same reason, LECs can shift costs to

---

[136]"At least three interexchange carriers -- AT&T, MCI, and Sprint -- have nationwide or near-nationwide facilities. These are large well-established companies with customers throughout the nation.  It may be unlikely, therefore, that a BOC affiliate, whose customers presumably would be concentrated in one geographic region, could drive one or more of these companies from the market." *Notice of Proposed Rulemaking*, FCC 96-308 (July 18, 1996).

[137]AT&T and MCI contend that both Telesis and SBC will have an incentive to discriminate against long distance rivals until the supply of switched access becomes fully competitive.  Brenner Direct Test. at 40.  According to Dr. Brenner, an independent Telesis and an independent SBC might discriminate against each other's long distance operations; the merged entity would eliminate the discrimination against SBC and Telesis long distance operations, but not against other carriers; and the merger would also eliminate competition between the companies.

This analysis, however, is incomplete.  First, the quality discrimination Dr. Brenner hypothesizes would be illegal. See 47 U.S.C. 272(c)(1).  Moreover, as Dr. Gilbert explains, Telesis and SBC service reports to long distance carriers and regulators already provide detailed information about service quality.  Gilbert Reply Test. at 26-30. See also Dorman Rebuttal Test. at 3.  Discrimination is particularly unlikely because it will not be effective unless customers of the rival "could readily detect that they were receiving inferior long distance connections," and yet the various regulatory agencies would be "unlikely to let such patently illegal [and necessarily obvious] discrimination to persist."  Reply of the Bell Companies in Support of Their Motion for Removal of Mobile and Other Wireless Services from the Scope of the Interexchange Restriction and Equal Access Requirement of Section II of the Decree, at 33, 34 n.40, *U.S.* v. *Western Elec. Co.*, No. 82-0192 (D.D.C. filed Aug. 3, 1992); Dorman Rebuttal Test. at 3.  Finally, we are not aware of any evidence that other local companies, such as GTE (when it owned Sprint) and Rochester Telephone Company, with these same hypothetical incentives have actually discriminated in favor of their long distance affiliates.  See *U.S.* v. *Western Elec. Co.*, 993 F.2d 1572, 1579 (D.C. Cir. 1993).

[138]  These now include stringent Telecommunications Act of 1996 Section 272 requirements that BOCs (1) operate long distance operations as separate subsidiaries, with separate books, officers and directors, and financial reserves; (2) conduct all transactions with its BOC affiliate "on an arm's length basis;" and (3) not discriminate "in the provision or procurement of goods, services, facilities, and information, or in the establishment of standards."

[139]UCAN suggests postponing approval of the merger until the applicants have obtained Section 271 "checklist" approval to enter long distance markets.  Binz Direct Test. at 31-33.  The applicants do not currently provide long distance services and the merger, by itself, will not affect competition within markets for those services.  Accordingly, we oppose the proposed condition.

[140]Much confusion surrounds this issue, however, because of either failures to fully specify all costs or failures to attribute costs to the services that "caused" them to be incurred.  Thus, for example, some observers contend that the costs of providing customers with access to the network are not "common" to all telecommunications services.  See Kahn & Shew, *Current Issues in Telecommunications Regulation:  Pricing*, 4 Yale J. on Reg. 191 (1987); Parson, *Seven Years after Kahn and Shew:  Lingering Myths on Costs and Pricing Telephone Service,* 11 Yale J. on Reg. 149, 152 (1994).  Instead, they argue, these costs should be directly attributable to a network access service, which is a service in its own right.  Parsons,

underprice rivals in many telecommunications markets.[141]  Stable systems of price cap regulation, however, preclude much of the incentive to engage in that behavior.[142]

## 2.  Price Cap Regulation

In theory, price cap regulation completely eliminates incentives to cross-subsidize competitive services.  As Section III explained, California's Category I and Category II prices for regulated services decline at a rate equal to the difference between a productivity factor and an inflation index.  The firm retains as profits the full difference between price and the cost of providing the regulated service.[143]  Thus, allocating to the regulated sector the costs of providing competitive services would only reduce these profits by an equal amount.

Cross-subsidization incentives are not fully eliminated, however, if the mechanism for revising the price caps does not respond appropriately to changes in the economic environment faced by the firm.  Regulatory agencies must revise price cap formulas when the assumptions underlying those formulas are no longer valid.  They must also determine the nature of the outdated assumption and the period during which it was invalid.  Failures to accurately classify invalid assumptions can provide significant opportunities for indirect cross-subsidization.

Thus, for example, it may be unclear whether a firm suffered losses during a particular year because events beyond its control prevented productivity increases from meeting expectations or because an input supplier unexpectedly raised its prices.  If the regulatory response is to reduce the productivity factor, the resulting price increases will be compounded at the same increased rate in future years this X-factor is in effect.  On the other hand, if it is found that a single exogenous event caused the losses, the resulting allowed revenue increase should be amortized over a single year, using the so-called Z-factor.  Accordingly, mistaking an exogenous, one-time cost increase for a permanent reduction in productivity growth can generate unnecessarily high prices and provide significant

---

*supra*, at 152.  By treating "loop costs" as common, however, "the marginal cost of subscriber access will be very low (or perhaps zero) and the common costs to be recovered by all services will be relatively high.  In contrast, if loop costs are accepted as directly attributable to subscriber access, then marginal costs for access will be high and common costs relatively low."  *Id.* at 163.  Moreover, the treatment of these costs will also affect the circumstances under which cross-subsidization will be inferred.  *Id.* at 164-65.

[141]The New York Public Service Commission found, for example, that an unregulated NYNEX subsidiary, Materials Enterprises Company (MECO), overcharged the parent for purchasing, supply, and other services provided to New York Telephone Company.  The Public Service Commission did not find that the practices were anticompetitive, but the overcharges presumably would have been reflected in the regulated rates of New York Telephone.  See Schwartz and Hoagg, *Vertical Divestiture:  Structural Reform of an RHC*, 44 Fed. Com. L.J. 285, 297 (1992).

[142]  Planning and investment costs are also reduced for alternative suppliers contemplating entry.

[143]In California, the Commission requires Pacific Bell to share with its customers 50 percent of earnings between 11.5 percent and 15 percent.  Pacific Bell also retains 70 percent of all earnings that exceed 15 percent, with the remainder of those earnings going to Pacific Bell customers.  D.94-06-011, 55 CPUC 2d 1, 11.

economic profits to suppliers in future rate periods. The firm can use these economic profits to finance below cost sales of competitive services.

## CONCLUSION

We conclude that this merger will not adversely affect competition within California telecommunications markets. Instead, the merger represents a calculated attempt by the applicants to meet evolving industry trends. There is no evidence that SBC would have entered California markets *de novo* or through a toehold acquisition in the absence of this merger. In fact, limited entry would be inconsistent with the firm's established investment strategy. Moreover, AT&T, MCI and other well-financed companies plan to provide service in major markets where entry is at least theoretically profitable. Entry by these and other firms has already reduced both prices and concentration levels within the intraLATA toll and direct access markets.

We also conclude that the merger by itself will not enhance anticompetitive cross-subsidization opportunities. To promote competition in the markets served by the applicants, however, we recommend that the Commission maintain a stable system of price cap regulation. In particular, we urge the Commission to carefully scrutinize requested adjustments to the formula, especially where the cause of unexpected cost increases is unclear. In addition, we suggest that the Commission separately treat regulated and unregulated (Category III) services.[144]

\* \* \* \* \*

---

[144]In a recent FCC proceeding, Professor Kahn came to the same conclusion:

> This means the Commission should *stop allocating* the costs of these multi-purpose facilities and *not change the price of regulated services* -- up or down -- in response to them. *That* is the way to see that purchasers of the regulated services are neither burdened nor benefitted by them -- which . . . is another way of saying that this is the way to put on the companies the entire burden of the additional costs to weigh against all of the benefits.

*Declaration of Alfred E. Kahn*, CC Docket No. 96-112, at ¶48 ("In the Matter of Allocation of Costs Associated with Local Exchange Carrier Provision of Video Programming Services") (July, 19, 1996).